Filed 10/30/25  P. v. Swanigan CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C102457 |
| Plaintiff and Respondent, | (Super. Ct. No. 06F09185) |
| v. | |
| WILLIAM SWANIGAN, | |
| Defendant and Appellant. | |

Defendant William Swanigan appeals from the trial court's denial of his petition for resentencing under Penal Code[1] section 1172.6 following an evidentiary hearing. Appellate counsel filed a brief raising no arguable issues under *People v. Wende* (1979) 25 Cal.3d 436 and *People v. Delgadillo* (2022) 14 Cal.5th 216.[2]  Counsel notified

---

[1]  Undesignated statutory references are to the Penal Code.

[2]  Appellate counsel contends this appeal should not be limited to the review process of *Delgadillo*, since it follows an evidentiary hearing.  Rather, counsel contends we should independently review the record for error pursuant to *Wende*, inviting this court to distinguish this case from *Delgadillo*, which was decided at the prima facie stage.  We decline the invitation to determine *Delgadillo*'s scope.  Instead, as in *Delgadillo*, we exercise our discretion to independently review the record.

Swanigan that he had 30 days to file a supplemental brief raising issues he wished this court to consider. Swanigan has filed a supplemental brief raising numerous contentions.

After considering Swanigan's contentions and independently examining the record, we affirm.

BACKGROUND

Around noon on July 16, 2006, Sacramento police officers responded to a shooting near Oak Park on 11th Avenue. They found a Hispanic male victim, Richard Bustillos, covered in blood, lying next to a gray Chevrolet Impala with both the driver's and passenger's front doors open. A .45-caliber bullet casing was found nearby.

The victim's wallet was on the center console, and crumpled money was in the driver's side area of the car as well as near the victim's groin area. The victim died at the scene of a single gunshot wound to the chest. The victim also had lacerations on either side of his head as well as a depressed skull fracture, which were consistent with being struck by the butt of a gun. Small abrasions were present on the left side of his face and neck.

Jose S. lived on 11th Avenue across the street from where the victim was killed and called the police after hearing two gunshots. Jose S. reported being on the second floor of his residence when he heard two people outside yelling and cursing, possibly about money. He looked out his screen door and saw an older gray car and an older white car with a convertible soft top, which he later identified as an older Mustang. He heard someone say, "Give me back my money."

Jose S. reported that he saw the passenger in the white car (a Black man between 20 and 25 years old wearing dark clothing) get out of the car, walk to the passenger side of the gray car, open the passenger door, and get inside the gray car. The driver of the gray car (the victim) then opened the driver's door and attempted to exit the gray car, but the passenger from the white car pulled the victim back inside the gray car. The driver of the white car (another Black man between 20 and 25 years old wearing a white tank top,

2

white shorts, and a white baseball cap) remained in the white car, ducking down. The driver of the white car eventually got out, walked between the two cars to the passenger side of the gray car, and tried to get the passenger from the white car to get out of the gray car, telling him "Come on, let's go." Jose S. heard a "pop," but was unsure if it was a gunshot; he then saw the driver of the white car run to the back of the gray car, duck down, and put his hands on the back of the gray car. At that point, Jose S. went downstairs to call the police, and heard another "pop," which he was sure was a gunshot. Jose S. went outside and saw that the white car was gone, while the gray car was still in the street; a foot or shoe appeared to be lying next to the driver's side of the gray car. The police arrived a short time later.

At trial, Jose S. said he could not remember any details about the shooting or his prior statements to the police. He claimed he only heard two shots and then went outside and saw the gray car in the street. He could not identify anyone involved in the crime.

Martin H. also lived on 11th Avenue several houses down from where Jose S. lived; Jose S.'s sister was Martin H.'s girlfriend. Martin H. was outside doing yardwork when he heard two gunshots and then heard a car revving up and speeding toward him. He saw a 1964 white Mustang convertible speed by with two Black men in their 20's. He went to Jose S.'s house to check on his girlfriend and saw a car stopped in the street with someone slumped outside the open driver's side door.

Simone M. had known Swanigan for several years and considered him her best friend. On the morning of the shooting, Swanigan called her and told her he was trying to get some money to go hang out or do something. Later that day, after the shooting, Swanigan called Simone M. again and told her he "went to go sell some weed to a Mexican." "He took him to go get some weed. They ended up getting in a little tussle and the pistol had went off." Swanigan told Simone M. he had kicked the victim and hit him in the face several times with a gun because the victim refused to give up his wallet. Swanigan said he eventually "popp[ed]" the victim, which Simone M. understood to

3

mean Swanigan shot the victim. Simone M. later told the police that Swanigan said, "I had to pop this [n----r] because he would not give me no money."

Later that night, Swanigan picked Simone M. up at her home so they could hang out. After visiting a friend in Sacramento, Swanigan was going to drop Simone M. off in Oakland and continue out of town to visit his father. He picked her up in a 1960's-era blue Mustang. According to Simone M., Swanigan always drove Mustangs.

Detective Ashley Englefield was dispatched to the crime scene and was informed the suspect might be driving a white, older Ford Mustang. Detective Englefield remembered seeing a Ford Mustang in the garage of Tobias Thomas and Jameelah Jones around April 2006; they had been arrested in February 2006 after a stolen police "bait" car turned up in their garage, and Thomas was subsequently convicted for the offense. While conducting a parole and probation check in April 2006, neither Thomas nor Jones were home, but Detective Englefield found two Black male adults in their garage working on an older white Mustang.

Detective Englefield called Jones to see if there was a connection between the white Mustang seen at the murder scene and the white Mustang he had seen months earlier in Jones's garage. Jones agreed to an interview. At the police station, Jones spoke to Detective Ike Jason. Detective Jason left Jones in the interview alone for approximately 30 minutes. As she waited in the interview room, she happened to receive a call on her cell phone from Swanigan, who said he wanted to see her and asked if she could "get a few bags [of heroin]." Swanigan told her he "had to get away," and that he "need[ed] to hurry up [because he] was still driving the car that [he] did the thing in." When she asked what "thing" he was referring to, Swanigan told her he "smacked a [n----r] on Eleventh Avenue."

When Detective Jason returned to the interview room, he asked Jones if she knew anything about the murder. Unbeknownst to Jones, her end of the conversation with

4

Swanigan had been monitored. Jason asked Jones to call Swanigan back so the police could record the telephone conversation, and she agreed

Jones called Swanigan back and asked him what happened. A recording of this phone call was played for the jury.

During this pretext call, Swanigan told Jones he did not know the victim's name but that "[w]ell, the [n----r], the [n----r] didn't want to give up the motherfucking money." When Jones asked him to explain further, Swanigan told her, "Nah, it's just a little lick . . . . [[N]…a], I went to go get a lick. He didn't want to give up the money, and he started trying to fight me back and shit, after I slapped him with the gun fifteen thousand times and he wasn't going out. [N…a], just, I bam. That's all I could put it for the . . . , and he just wanted to—he just wanted to die for his shit. So I popped his motherfucking ass." Swanigan also told Jones the victim had tried to fight back by kicking him but that "[e]very time he'd stop I was slapping him three or four times at a time with the gun."

When Jones asked Swanigan when this event had occurred, Swanigan said three hours ago. Swanigan said he could not pick her up at the park to go smoke because there were still lots of police by the park. Jones asked what kind of car Swanigan was driving and he told her he was in a Mustang on the freeway on his way to the Bay Area.

Detective Jason stepped out of the interview room and Jones then received another call from Swanigan, which was recorded and played for the jury. During this call, Swanigan told Jones he was with Simone M. At trial, Detective Jason identified the voice in the calls to Jones as Swanigan, having spoken to Swanigan several times during the investigation and having listened to several of his recorded jail phone calls or recorded jail visits. He also confirmed that one of the phone numbers Swanigan used to speak with Jones during the pretext calls was Simone M.'s number.

Detective Jason testified that he did not know how the victim and Swanigan had met up to facilitate a narcotics transaction. But he said it was very easy to buy marijuana in Oak Park where the victim was killed as intended buyers often simply flagged down

dealers to purchase drugs. According to Jason, sometimes buyers or sellers would use a purported drug transaction as a pretext to rob someone.

Jones also testified a man named Kevin Kemp worked on Mustangs at her house many times in the past, sometimes with Swanigan. In April 2006, Kemp had been investigated for selling stolen Mustang parts, and later had been arrested, prosecuted, and convicted of running a stolen car operation. At trial, Kemp's uncle testified that sometime after the murder, Swanigan told him and Kemp, "I just hurt somebody, man. I got into a hassle, . . . I need to leave."

No fingerprints were found on the money located in or around the victim's car or on the shell casing recovered from the scene. Multiple fingerprints were recovered from the surface of the victim's car, but only one was of sufficient quality for identification purposes and that fingerprint belonged to the victim's aunt who had been in the car prior to the killing. A small baggie of marijuana was located underneath the cup holder in the center console of the victim's car. No fingerprints were recovered from the baggie, but the DNA profiles of two separate persons were present; the first profile did not belong to Swanigan and the second belonged to an unidentified female.

During closing arguments at his original trial, defense counsel stated, "Let's be absolutely clear about my position in this case. Mr. Swanigan did not kill Mr. Bustillos. That is my position. That is the state of the evidence." Counsel noted that no direct evidence linked Swanigan to a white Mustang, which had never been found, that Swanigan denied killing the victim during a jail phone call and said that Jones had set him up, and that no fingerprint or DNA evidence was found linking Swanigan to the crime scene. Counsel conceded the evidence showed the victim "died from a single gunshot wound to the chest. Someone fired a gun that put a bullet through his body and killed him. And you have to decide to the exclusion of any other reasonable alternative that it can only be Mr. Swanigan. That is proof beyond a reasonable doubt."

6

The jury found Swanigan guilty of murder (§ 187, subd. (a)), and attempted robbery (§ 211/664), and further found he intentionally and personally discharged a firearm causing the victim's death during both offenses (§ 12022.53, subd. (d)). The jury also found true the special circumstance that Swanigan committed the murder during the commission of the attempted robbery. (§ 190.2, subd. (a)(17).)

The trial court sentenced Swanigan to life in prison without the possibility of parole for the murder, plus 25 years to life for the firearm enhancement. For the attempted robbery, the trial court imposed two years, plus 25 years to life for the firearm enhancement, both of which the court stayed under section 654.

Swanigan appealed, arguing (among other things) the evidence was insufficient to convict him of attempted robbery, and thus insufficient to convict him of attempted robbery-felony murder. In *People v. Swanigan* (Oct. 2, 2009, C058797) [nonpub. opn.], this court rejected the claim, concluding sufficient evidence supported Swanigan's attempted robbery conviction, and, hence, the special-circumstance finding based on attempted robbery. After striking various fines, we affirmed Swanigan's convictions in full.

In March 2022, Swanigan filed a form petition for resentencing under what is now section 1172.6 (former section 1170.95), asserting he could no longer be convicted of murder based on subsequent changes to the murder statutes. The trial court issued an order to show cause for an evidentiary hearing.

The People's prehearing brief indicated that at the evidentiary hearing they intended to rely solely on the clerk's and reporter's transcripts from Swanigan's trial. Based on the trial record, the People argued Swanigan was the sole assailant and shooter and was guilty beyond a reasonable doubt of committing express and implied malice murder. As the actual killer, the People also argued Swanigan could still be found guilty based on current felony-murder law.

After multiple extensions, in April 2024, defense counsel filed Swanigan's prehearing brief, which discussed current murder law and argued that because the prosecution intended to rely on the trial record rather than present live testimony, the trial court, as an independent trier of fact, could infer if the witnesses had been called today, they would not provide favorable testimony to the People on the issue of express or implied malice. Swanigan's brief did not object to admitting the trial record at the hearing and it did not identify any new or additional evidence he intended to present, although it stated investigation and research was ongoing and Swanigan would present his "affirmative case and factual review at such time as the hearing." Defense counsel also highlighted certain jury instructions the court should consider in determining whether the People had met their burden of proof at the hearing.

At the evidentiary hearing, the trial court admitted the underlying trial record as evidence. Defense counsel then informed the court that he intended to call Swanigan and Brian Tillis as witnesses. As an offer of proof, counsel asserted Swanigan was anticipated to testify he was not the shooter, although he was present at the shooting and did aid and abet the robbery after the fact by acting as a getaway driver for the actual shooter. Counsel also believed Tillis would testify about events that would corroborate Swanigan's anticipated testimony concerning what preceded the homicide, that Tillis had given Swanigan a large sum of money earlier the day of the killing, which would show Swanigan did not have a motive to commit the robbery, and that Tillis had never seen Swanigan with a gun before, which counsel argued would show Swanigan was not the principal robber but an accessory after the fact.

The People objected to the proffered testimony as irrelevant because the trial court was precluded from making factual determinations contrary to what the jury had found true during trial. Because the evidence showed the victim died from a single gunshot wound and the jury found Swanigan personally and intentionally discharged the firearm

causing the victim's death under section 12022.53, subdivision (d), the jury necessarily found Swanigan was the shooter who killed the victim.

Defense counsel responded that issue preclusion did not categorically preempt the court from making contrary findings because some exceptions to the preclusion doctrine based on significant changes in the law might apply. Counsel noted that had Swanigan testified at trial to what he intended to testify to at the evidentiary hearing, the jury would have found him guilty of felony murder because at that time it did not matter whether he was the actual killer.

At a continued hearing, defense counsel asked the court to find an equitable exception to the doctrine of issue preclusion while the prosecution reiterated that Swanigan's and Tillis's anticipated testimony was irrelevant because the trial court was precluded from determining Swanigan was not the actual killer given the jury's prior finding that Swanigan personally and intentionally shot and killed the victim. The trial court ruled there had been no change in the law that would warrant applying an equitable exception to the doctrine of issue preclusion. Given the court's ruling, neither Swanigan nor Tillis testified.

Considering the trial evidence as an independent trier of fact, the trial court found the evidence showed, beyond a reasonable doubt, Swanigan acted with express malice when he shot and killed the victim. In so finding, the court noted that on the afternoon of the homicide, Swanigan called Jameelah Jones on the telephone while she happened to be at the police station and he told her "he had tried to rob a Mexican three hours earlier," but the person did not want to give up the money and started to fight back against Swanigan. Swanigan "slapped him with a gun 15 thousand times." Swanigan then said the man "just wanted to die for his shit so I popped his motherfucking ass." Swanigan told Jones this occurred on 11th Avenue where the victim was found dead next to his car. Swanigan told his friend Simone M. a similar version of events the day of the murder. Simone M. told the police Swanigan said, "he had gone to sell weed to a Mexican," but

9

he had to "pop" the man "because he would not give me no money." Swanigan also admitted to her the man would not give up the money even after being hit so Swanigan shot him.

The trial court found that the statements Swanigan made the day the victim was killed matched the physical evidence of the crime. The victim was found outside his Chevy on 11th Avenue; he had been shot in the chest and had lacerations on both sides of his head with a depressed skull fracture that was consistent with being struck with a gun. Crumpled money was found around the body. Two neighbors on 11th Avenue observed two Black males between the age of 20 and 25 in a white Mustang before and after hearing gunshots, and the victim suffered only one gunshot wound.

Based on the evidence, the trial court found Swanigan acted with express malice when he first beat the victim with the gun and then shot him at close range in the chest, evidencing an intent to kill, rather than merely injure, after the victim refused to give Swanigan his money. The court found beyond a reasonable doubt the murder was done willfully, deliberately, and with premeditation. The court also found, beyond a reasonable doubt, Swanigan was still guilty of first degree felony murder because he personally killed the victim during the attempted robbery. The court therefore denied the petition. Swanigan timely appealed in November 2024. His *Wende* brief was filed in May 2025, and this case became fully briefed on July 9, 2025.

DISCUSSION

I

*Applicable Law*

Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill No. 1437) amended "the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to

10

human life." (Stats. 2018, ch. 1015, § 1, subd. (f); see *People v. Lewis* (2021) 11 Cal.5th 952, 959.) Senate Bill No. 1437 did so by amending sections 188 and 189.

Section 188, subdivision (a)(3), now provides: "Except as stated in subdivision (e) of section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." Section 189, subdivision (e)(1)-(3), in turn, now provides: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

Senate Bill No. 1437 also created a procedural mechanism in section 1172.6 for those convicted under the former law to seek retroactive relief under the law as amended. (*People v. Lewis*, *supra*, 11 Cal.5th at p. 957.) Senate Bill No. 775 (2021-2022 Reg. Sess.) later expanded the statute to apply to attempted murder under the natural and probable consequence doctrine and manslaughter. (Stats. 2021, ch. 551, § 2.)

Under section 1172.6, if a petitioner files a facially sufficient petition and makes a sufficient prima facie showing he or she is entitled to relief (§ 1172.6, subds. (a)-(c)), the trial court must issue an order to show cause and conduct an evidentiary hearing where the prosecution bears the burden of proving beyond a reasonable doubt the defendant could still be convicted of murder under current law (§ 1172.6, subds. (c), (d)).

At the evidentiary hearing to determine whether the petitioner is entitled to relief, the admission of evidence is "governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible

11

under current law, including witness testimony, stipulated evidence, and matter judicially noticed." (§ 1172.6, subd. (d)(3).) The court may also consider the procedural history of the case recited in any prior appellate opinion. (*Ibid.*) Hearsay evidence admitted in a preliminary hearing pursuant to subdivision (b) of section 872 must be excluded from the hearing as hearsay unless the evidence is admissible under another exception to the hearsay rule. (§ 1172.6, subd. (d)(3).) Both the prosecutor and the petitioner may offer new or additional evidence to meet their respective burdens. (*Ibid.*)

II

*Analysis*

Swanigan first argues the attorney appointed to represent him in the section 1172.6 proceedings below provided ineffective assistance of counsel.[3] He contends counsel's prehearing brief was inadequate because it did not include a summary or statement of Swanigan's alleged "new evidence" to support his "alternative theory" of the case—that he was not the shooter nor was this an attempted robbery but rather a drug deal gone bad. He adds counsel did not present the court with exculpatory evidence requested by the jury during deliberations (the police interview with Jose S. who testified at trial), and did not admit the direct evidence from the trial, including the DNA analysis and fingerprint evidence that matched an unknown male and female but not Swanigan and the testimony of the victim's former girlfriend who said the victim bought and sold marijuana from people he knew and she did not know Swanigan. Nor did counsel explain the pretext call with Jameelah Jones or investigate the coroner's report to see if the victim had gunshot

---

[3] Although Swanigan's supplemental brief notes defense counsel obtained several continuances to file the prehearing brief, Swanigan does not argue the trial court erred in granting the continuances. We therefore focus on the alleged deficiencies Swanigan identifies in counsel's prehearing brief.

12

residue on him, which Swanigan speculates might show the victim fired at Swanigan's car before the actual killer fired back.

To prevail on a claim of ineffective assistance of counsel, Swanigan bears the burden of showing (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced him. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) " 'Surmounting *Strickland*'s high bar is never an easy task' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105), and Swanigan has failed to meet this burden here.

At the outset, we note the record belies Swanigan's claim that the trial evidence was not presented at the evidentiary hearing. The prosecutor submitted the complete trial record as evidence at the hearing, defense counsel did not object to admission of the evidence, and the trial court admitted the evidence during the hearing. There was no need for defense counsel to resubmit the same evidence.

To the extent Swanigan argues his counsel should have submitted Jose S.'s police interview as evidence, Jose S.'s out-of-court statement to the police constituted hearsay that was not admissible at the evidentiary hearing absent an exception. (§ 1172.6, subd. (d)(3) [admission of evidence is governed by the Evidence Code]; Evid. Code, § 1200, subd. (a) [hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated"]; *People v. Sanchez* (2016) 63 Cal.4th 665, 674 [hearsay is generally inadmissible unless it falls under an exception].) Swanigan has not sustained his burden of showing how this evidence was admissible.[4]

---

[4] We further note that during trial the prosecutor impeached Jose S. with his prior inconsistent statements to police, including the description of the suspects he saw during the shooting incident, and the officer who interviewed Jose S. testified as to Jose S.'s

It is true defense counsel's prehearing brief did not include a summary of Swanigan's "alternative theory" of the case, namely, that he was not the actual shooter. But defense counsel did present and argue that theory to the trial court at the evidentiary hearing when he proffered Swanigan and Tillis as potential witnesses and described their anticipated testimony. Thus, the court was fully aware of Swanigan's contention that he was not the actual shooter, and any failure to include a summary in the prehearing brief was not prejudicial.

Swanigan's claim that defense counsel failed to investigate whether there was any gunshot residue on the victim is mere speculation. First, the record does not show defense counsel did *not* undertake such an investigation. Second, nothing suggests there was any evidence to support the argument that the victim fired first and the actual killer, who Swanigan asserts was not him, fired back. Notably, the forensic pathologist who conducted the victim's autopsy testified at trial. She did not testify to finding any gunshot residue on the victim during the autopsy. Had she found any gunshot residue on the victim, it is highly likely both the prosecutor and defense counsel would have asked her about it. The absence of this line of questioning implies no such evidence was found during the autopsy. As a result, defense counsel could have had a rational tactical purpose in not advancing a gunshot residue argument below and, thus, Swanigan cannot establish ineffective assistance. (*People v. Earp* (1999) 20 Cal.4th 826, 896 ["When, as here, defense counsel's reasons for conducting the defense case in a particular way are not readily apparent from the record, we will not assume inadequacy of representation unless there could have been ' "no conceivable tactical purpose" ' for counsel's actions"].)

---

statements during the police interview. Thus, as part of the trial record, that evidence was before the trial court at the evidentiary hearing.

While Swanigan argues defense counsel failed to explain his pretext call with Jameelah Jones in which he admitted beating the victim with the gun before shooting him, we conclude any error was harmless. Swanigan's original trial counsel repeatedly attacked Jones's credibility and said it was not Swanigan who the police recorded speaking with Jones. Recorded jail phone calls were also admitted at trial showing Swanigan said Jones had set him up. Even if counsel's failure to further explain the pretext call in his prehearing brief could be characterized as deficient, other evidence in the record showed Swanigan had separately admitted essentially the same facts to his friend Simone M. when he called her the day of the killing. Thus, an explanation discounting the pretext call would have been of limited value.

Finally, Swanigan argues the trial court erred in not allowing him to testify during the evidentiary hearing to support his claims of innocence. Swanigan correctly notes section 1172.6 allows a petitioner to present new or additional evidence at an evidentiary hearing. (§ 1172.6, subd. (d)(3).) Even if we assume the court procedurally erred in disallowing Swanigan's and Tillis's testimony at the evidentiary hearing, we conclude any error was harmless beyond a reasonable doubt. (See *People v. Mulcrevy* (2014) 233 Cal.App.4th 127, 131 [violation of a criminal defendant's due process right to present a defense subject to review under harmless-beyond-a-reasonable-doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18].)

It is undisputed the victim was killed by a single gunshot wound to the chest, and by finding the section 12022.53, subdivision (d) enhancement true the jury necessarily found Swanigan personally and intentionally fired the fatal shot. Swanigan's proffered testimony that he was not the actual shooter contradicts the jury's finding. The doctrine of issue preclusion prohibited the court from finding Swanigan was not the actual shooter.

Issue preclusion generally bars relitigation of issues earlier decided if the issue sought to be precluded from relitigation is identical to that decided in a former proceeding, the issue was actually litigated and necessarily decided in the former

15

proceeding, and the decision in the former proceeding is final and on the merits. (*People v. Strong* (2022) 13 Cal.5th 698, 715-716.) The party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. (*Ibid.*) Our Supreme Court has recognized that under certain circumstances a prior jury finding can have a preclusive effect in a subsequent section 1172.6 proceeding. (*Strong*, at p. 716; see also *People v. Curiel* (2023) 15 Cal.5th 433, 454 ["it is difficult to foresee a situation in which a relevant jury finding, embodied in a final criminal judgment, would not meet the traditional elements of issue preclusion"].)

Here, in his closing argument during trial, defense counsel emphasized his position that Swanigan "did not kill [the victim]," and said that because the victim died from a single gunshot wound to the chest and "somebody fired a gun that put a bullet through his body and killed him," the jury had to decide "to the exclusion of any other reasonable alternative that it can only be Mr. Swanigan." Thus, the issue sought to be precluded in the section 1172.6 evidentiary hearing was the same issue actually litigated and necessarily decided at trial. (*People v. Curiel*, *supra*, 15 Cal.5th at p. 453 [concluding the jury's intent-to-kill finding meets the traditional threshold requirements for issue preclusion].)

We recognize that under some circumstances an equitable exception to issue preclusion may apply where there has been a significant change in the law since the factual findings were rendered that warrants reexamining the issue. (See, e.g., *People v. Strong*, *supra*, 13 Cal.5th at pp. 716-717 [the Supreme Court's clarification of what it means to be a major participant who acted with reckless indifference to human life in *People v. Banks* (2015) 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522 represented the sort of significant change that has traditionally been thought to warrant reexamination of an earlier-litigated special-circumstance finding].) But Swanigan did not suggest below (nor does he on appeal) that any relevant law has changed. (Cf. *People v. Curiel*, *supra*, 15 Cal.5th at p. 455 [the defendant did not identify any change in

the law that would justify departing from the general rule of issue preclusion based on the jury's intent-to-kill finding; the same standards that governed the intent-to-kill finding at the time of his trial still existed today].)

We agree with the trial court that no equitable exception to the issue-preclusion doctrine applied to the jury's true finding that Swanigan personally and intentionally discharged a firearm, killing the victim as no significant changes in the law had occurred since the jury made the finding. Given the preclusive effect of the jury's true finding that Swanigan shot and killed the victim, any error in prohibiting Swanigan from testifying that he did not shoot and kill the victim was harmless.

After considering the arguments raised in Swanigan's supplemental brief, and having independently reviewed the record, we conclude no other arguable error would result in a disposition more favorable to him.

DISPOSITION

The order denying Swanigan's petition for resentencing under section 1172.6 is affirmed.

/s/
BOULWARE EURIE, J.

We concur:


/s/
HULL, Acting P. J.


/s/
ROBIE, J.

17